IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                    Case No's 07-10143-JTM

TRACY HARRIS,
    a/k/a "T Dog,"
CLINTON A.D. KNIGHT,
    a/k/a "Tone,"
CHESTER RANDALL, Jr.,
    a/k/a "Insane June,"

        Defendants.

MEMORANDUM AND ORDER

Following an extensive trial, which included the testimony of 82 witnesses, on racketeering charges relating to the activities of the Neighborhood Crips gang in Wichita, Kansas, defendants Chester Randall, Clinton Knight, and Tracy Harris were convicted of various counts. The defendants have all moved for acquittal or a new trial.

The defendants were initially indicted, along with numerous other alleged participants in the Crips gang, on July 27, 2007. Through subsequent superseding indictments, defendant Randall was charged with (1) participating in a racketeer influenced and corrupt organization (RICO) (in violation

1

of 18 U.S.C. § 1962(c)); (2) conspiracy to participate in a RICO enterprise (18 U.S.C. § 1962(d));

(3) conspiracy to distribute crack cocaine (21 U.S.C. § 846, 841); and (4) conspiracy to distribute

marijuana (21 U.S.C. §§ 846, 841). The government dismissed the substantive RICO count against

Randall prior to the submission of the case to the jury. Defendant Knight was charged with (1)

participating in the conduct of a RICO enterprise; (2) conspiring to participate in the affairs of a

RICO enterprise; (3) conspiracy to distribute crack cocaine; (4) conspiracy to distribute marijuana;

(5) possession with intent to distribute crack cocaine (21 U.S.C. § 841); and (6) two counts of

maintaining a drug house (21 U.S.C. § 856). Defendant Harris was charged with (1) participating in

a RICO enterprise; (2) conspiracy to participate in a RICO enterprise; (3) being a felon in possession

of a firearm (18 U.S.C. § 922(g)); (4) possession of a firearm in connection with a drug trafficking

crime or crime of violence; (5) possession of a controlled substance with intent to distribute  (21

U.S.C. § 841); (6) conspiracy to distribute crack cocaine; (7) conspiracy to distribute marijuana; and

(8) two counts of wire fraud (18 U.S.C. § 1343). Some of these charges were dismissed prior to the

jury's deliberations.

    A multi-week jury trial began on October 7, 2008.  The jury returned its verdict on November

5. (Dkt. 415) The jury found defendant Randall guilty of participation in a RICO conspiracy and not

guilty of the conspiracy to distribute drug charges. The jury found defendant Knight guilty of both

the RICO substantive and conspiracy counts, conspiracy to distribute marijuana, possession with

intent to distribute crack cocaine, and maintaining a drug house (Count 26, 1332 N. Volutsia). The

jury found Knight not guilty of conspiracy to distribute cocaine base and the second count alleging

maintenance of a drug house (Count 27, 1641 N. Lorraine). The jury found Harris guilty of

conspiracy to engage in RICO activity, firearm possession by a felon, and wire fraud. The jury found

Harris not guilty of the substantive RICO charge, possession of a firearm in furtherance of a crime, and possession of a controlled substance with intent to distribute.

The defendants seek either acquittal or a new trial, citing various alleged errors. Defendant Randall alleges that there was insufficient evidence to support his conviction on the RICO conspiracy charge, and the government committed prosecutorial misconduct.

Defendant Knight also challenges the sufficiency of the evidence, and further cites as error the instructions submitted to the jury, the failure of the government to disclose information relating to a promise of lenient treatment for a witness, the submission of evidence relating to uncharged conduct, the failure to allow adequate opportunity for counsel to prepare for and respond to that evidence, and the rejection of his other pre-trial motions. Defendant Knight contends that the evidence was insufficient to support his convictions for RICO conspiracy and wire fraud and challenges the jury instruction relating to a RICO enterprise.

Defendant Harris presents five arguments, two relating to the instructions and three involving sufficiency of the evidence. He argues that (1) the Count 2 instruction was in error; (2) the evidence was insufficient to prove the existence of a RICO enterprise, (3) the evidence was insufficient to prove that Harris "knew of and agreed to facilitate" two predicate acts, (4) the court erred in failing to give a withdrawal instruction, and (5) the evidence was insufficient to support the wire fraud conviction.

**Standards of Review**

Under Fed.R.Crim.P. 29(c), the court may set aside a judgment of guilty and enter a verdict of acquittal. A motion for judgment of acquittal challenges the sufficiency of the evidence. When the sufficiency of the evidence supporting a criminal conviction is challenged, the court examines the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. McKissick*, 204 F.3d 1282, 1289-90 (10th Cir. 2000) *United States v. Miller*, 987 F.2d 1462, 1464 (10th Cir.1993). In reviewing the sufficiency of the evidence, the court must consider both direct and circumstantial evidence, as well as reasonable inferences to be drawn from that evidence. *United States v. Davis*, 1 F.3d 1014, 1017 (10th Cir.1993) (*citing United States v. Fox*, 902 F.2d 1508, 1513 (10th Cir.), *cert. denied*, 498 U.S. 874 (1990)).

The court must accept the jury's resolution of conflicting evidence, as well as the jury's apparent credibility calls. *Davis*, 1 F.3d at 1017 (*citing United States v. Youngpeter*, 986 F.2d 349, 352 (10th Cir.1993)). The court "'may neither weigh conflicting evidence nor consider the credibility of witnesses.'" *McKissick*, 204 F.3d at 1289 (*quoting United States v. Pappert*, 112 F.3d 1073, 1077 (10th Cir. 1997)). Because of the "deep respect for the fact-finding function of the jury," the burden is high for a party challenging a jury verdict. *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994)(*quoting United States v. White*, 673 F.2d at 302).

Under Rule 33, courts may grant a defendant a new trial "if required in the interest of justice." Such motions are viewed with disfavor and granted only with great caution. *United States v. Pearson*, 203 F.3d 1243, 1274 (10th Cir. 2000); *United States v. Chatman*, 994 F.2d 1510, 1518 (10th Cir.), *cert. denied*, 510 U.S. 883 (1993); *United States v. Ruedlinger*, 976 F.Supp. 976, 979 (D.Kan.1997). The defendant has the burden of proving the necessity of a new trial. *United States v. Davis*, 15 F.3d

526, 531 (6th Cir.1994). The motion should be granted only if there has been "'[a]ny error of sufficient magnitude to require reversal on appeal.'" *United States v. Walters*, 89 F.Supp.2d 1206, 1213 (D.Kan.2000) (*quoting* 3 Charles A. Wright, Federal Practice and Procedure: Criminal 2d § 551 (1982), *aff'd*, 28 Fed. Appx. 902 (10th Cir.2001). The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See United States v. Patterson*, 41 F.3d 577, 579 (10th Cir.1994).

**The Crips as an Enterprise**

All defendants were found guilty of RICO conspiracy.  Of the two defendants charged with a substantive violation of the RICO statute, the jury found that the defendant Knight was guilty and that defendant Harris was not guilty. Each of the defendants challenges their RICO conspiracy conviction.

The court finds that arguments by defendants Knight and Harris as to the sufficiency of the evidence relating to the existence of a criminal enterprise do not support the relief sought.  Further, defendant Randall's arguments that there is insufficient evidence to support his RICO conspiracy conviction is also without merit.

Knight first argues that the government failed to prove that the Crips were a criminal enterprise. He cites testimony from one of the government's experts that there was no single entity known as "the Crips," and by co-operating witnesses indicating competition among the subsets of the Crips, and the lack of any overall leader. Knight also cites to the testimony of the defense-retained gang expert, Alex Alonso, who provided similar evidence.

Second, Knight alleges that there was a failure to show any nexus between the predicate acts and the affairs of the Crips enterprise, citing *United States v. Smith*, 413 F.3d 1253 , 1269 (10th Cir. 2005). Knight argues that drug sales were unrelated to gang activity, citing the testimony of co-operating witnesses stating that they participated in drug sales in which profits were not shared among gang members.

Third, Knight stresses in particular that the charge of conspiracy to distribute marijuana was supported only by former co-defendant and co-operating witness Trena Ridge, "the least credible witness called by the Government." (Dkt. 460, at 13).

In his motion, Harris stresses that the Crips gang members were primarily members of the gang subsets, which "had a separate handshake, had separate leaders, and had separate members," and thus "shared a common name of Crips and the colors but nothing more." (Dkt. 461, at 7).

The defendant Knight's arguments would be persuasive if the RICO statute required evidence of a rigidly monolithic, hierarchical entity operating under a single leader, with universally applied rules of loyalty and profit-sharing for all criminal activity conducted by its members. It does not. *See Boyle v. United States*, 129 S.Ct. 2237 (2009).

In *Boyle*, the Court was presented with the question of whether an association-in-fact RICO enterprise must have some ascertainable structure, beyond that inherent in the racketeering activity of the enterprise. 129 S.Ct at 2244. The enterprise in question was a bank theft ring, which usually struck at the bank's night-deposit boxes. The ring was not highly structured:

> Each theft was typically carried out by a group of participants who met beforehand to plan the crime, gather tools (such as crowbars, fishing gaffs, and walkie-talkies), and assign the roles that each participant would play (such as lookout and driver). The participants generally split the proceeds from the thefts. The group was loosely and informally organized. It does not appear to have had a leader or hierarchy; nor does

6

it appear that the participants ever formulated any long-term master plan or agreement.

*Id.* at 2243.

In *United States v. Turkette*, 452 U.S. 576 (1981), the Court had defined an association-in-fact as "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583. The *Boyle* Court agreed that under RICO an enterprise-in-fact must have a common purpose, relationships among its members, and a lifetime sufficient to allow the pursuit of that purpose. Following this, the Court turned to "[t]he crux of petitioners argument," which was that the alleged enterprise

must have structural features in addition to those that we think can be fairly inferred from the language of the statute. Although petitioner concedes that an association-in-fact enterprise may be an informal group and that not much structure is needed, he contends that such an enterprise must have at least some additional structural attributes, such as a structural hierarchy, role differentiation, a unique modus operandi, a chain of command, professionalism and sophistication of organization, diversity and complexity of crimes, membership dues, rules and regulations, uncharged or additional crimes aside from predicate acts, an internal discipline mechanism, regular meetings regarding enterprise affairs, an enterprise name, and induction or initiation ceremonies and rituals.

*Id.* at 2245 (quotations and brief references omitted).

The Court rejected petitioner's argument:

We see no basis in the language of RICO for the structural requirements that petitioner asks us to recognize. As we said in *Turkette*, an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods-by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity

7

punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 2245-46

Further, the Court contrasted the RICO statute with other federal anti-racketeering statutes, which do specifically include specific organizational requirements:

For example, 18 U.S.C. § 1955(b), which was enacted together with RICO as part of the Organized Crime Control Act of 1970, 84 Stat. 922, defines an "illegal gambling business" as one that "involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business." A "continuing criminal enterprise," as defined in 21 U.S.C. § 848(c), must involve more than five persons who act in concert and must have an "organizer," supervisor, or other manager. Congress included no such requirements in RICO.

*Id*. at 2446.

Ultimately, the *Boyle* Court approved as "correct and adequate" RICO enterprise instructions similar to that issued herein. *Id.* at 2247.

 These instructions explicitly told the jurors that they could not convict on the RICO charges unless they found that the Government had proved the existence of an enterprise. The instructions made clear that this was a separate element from the pattern of racketeering activity.
     The instructions also adequately told the jury that the enterprise needed to have the structural attributes that may be inferred from the statutory language. As noted, the trial judge told the jury that the Government was required to prove that there was "an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives" and that "the various members and associates of the association function[ed] as a continuing unit to achieve a common purpose."

*Id.* (record citations omitted).

With respect to defendant Knight's other arguments, the credibility of the witness Trena Ridge was an issue for the jury. A rational juror, finding Ridge testified credibly, could reasonable convict Knight of the crime of conspiracy to distribute marijuana on the basis of Ridge's testimony. Similarly,

8

the jury could discount the testimony of defense gang expert Alonso based upon either contrary evidence from the government's witnesses, or by the unfamiliarity of Alonso with the operation of gangs in Wichita, as opposed to Los Angeles.

More generally, that Crips foot-soldiers may keep some drug money for themselves, or that there was no single leader to the Crips, are not fatal to the government's RICO case. Beyond the requirements of a common purpose, relationships among members for the achievement of that purpose, and sufficient longevity for the pursuit of that purpose, the RICO statute does not require the government prove the existence of any particular structure to an association-in-fact enterprise.

Based on the evidence submitted, a rational juror could conclude that the Crips have operated for many years as a street gang in Wichita, Kansas. Each of the defendants were members of the Crips, and defendant Knight was one of the founders of the 23rd Street, or Deuce Trey, subset of the Wichita Neighborhood Crips. One of the key purposes of the Crips is to facilitate the ability of its members to engage in illegal activity, primarily narcotics trafficking, but also including prostitution, firearms-related offenses, intimidation of witnesses, and money laundering. While lacking any rigidly-defined hierarchy, the gang violently restricted its membership by conducting beatings of prospective members. Wichita Crips gang members avoid association with members from other gangs and identify members through hand signs, tattoos, and the color of their clothing.

Violence was an important element of gang culture, being employed as a means of restricting membership and policing the behavior of members. Firearms were used by gang members as a means of protection and for the commission of robberies. Gang members sold or loaned firearms to other members. Members of the Crips build reputation and influence within the gang by promising, and then performing, acts of violence. Members of the Crips beat up rival gang members, as well as, in the

words of one witness, "anybody who just crossed me the wrong way." (Dkt. 388 at 51). These assaults were primarily with firearms, but gang members also employed "[b]oards, sticks, hands, whatever," and the message was, "just don't cross us, or you'll be dealt with." *(Id*.) Members were expected to "put in work," which meant going out and shooting at other persons.

Drugs are also an important part of gang activity. The Wichita Crips deal in cocaine, ecstasy (methamphetamine), and marijuana. Almost all gang members sell cocaine. Gang membership is important to the drug trade because street contacts are an important part of the drug trafficking network, and gang members enjoy a reputation for having better-quality drugs. Gang members distribute drugs for resale to other gang members, sometimes doing so on credit. Younger members would sell drugs for older gang members.

Members also control or maintain houses in Wichita where drugs can be distributed to users and lower level distributors. These houses frequently were maintained in the name of one of the gang's female members. At these houses, the defendants cooked crack cocaine and made deliveries of drugs. Numerous witnesses testified to seeing Knight with a gun. Knight was also personally present at gang beatings and in at least one instance initiated a group beating by punching another member in the back of the head for a perceived violation of gang rules.

While the Crips in Wichita have several subsets, such as the Deuce Treys and the younger Tre Five Sevens, the subsets generally got along together. Conflict between members of different Crips subsets was ordinarily restricted to individuals; if the conflicts rose to entire gang subsets, gang leaders would step in to resolve the situation. Differences were resolved by agreement. Violence typically was reserved for other gangs, such as the Bloods.

While the Wichita Crips do not have any single leader, some gang members have leadership roles, and gang members are ranked by their status. Gang members generally met once a week at a local park, and members could be punished for failing to attend enough meetings. Gang members strove to "earn stripes," meaning to increase their gang status by staying active in the gang. (Dkt. 387 at 194; 400 at 61). One means of increasing status was having a reputation as a good drug dealer. A member who advanced his status sufficiently was known as a "rider," meaning "[s]omebody who does a lot for the set." (Dkt. 397 at 102). Gang members could also rise to leadership positions, based on their seniority, when existing leaders were serving prison terms. (Dkt. 409 at 105). Gang leaders enjoyed the ability to direct other members, so that

> you don't have to go out on the shootings anymore. You can send other people to do them. You don't even have to sell your drugs anymore if you don't want to. You can have younger dudes do that. And you usually off the front line of whatever is going on.

(Dkt. 400 at 62).

Some gang members were known as "OG" (an "original gangster," one of the founders of the gang) or a "shot caller" – someone who "tells everybody what to do." (Dkt. 388 at 67). Knight, along with co-defendant Armand Little, took a leadership role in the violence and "would send some of the younger homies out and tell them to go out and put some work, meaning go out and shoot at different people." (Dkt. 388 at 64; Dkt. 387 at 193). This most frequently took the form of drive-by shootings. Leaders such as Knight could also initiate the severe, violent beatings - known as being "taken off the set" or "taken off the hood" -- by which a member might be expelled from the gang. (Dkt. 388 at 80).

While a new member beating ("jump in") could be severe, beatings for a violation of gang rules were more violent and "no holds barred." (Dkt. 387 at 201). Gang members were subject to severe punishment for wearing the wrong color or associating with the members of other gangs. There were also rules for female gang members which required them to accept criminal responsibility for the acts of male gang members.

> If you making runs or go sell some drugs, she can hold it because she can – she can hold the drugs or the gun, so if you got pulled over, she could take the case, or if she was sitting in the drug house or where if it got raided, she would take the case.

(Dkt. 400 at 65). OG leaders would "hold court" to determine if gang members had violated these and other rules. (Dkt. 388 at 95; 409 at 106). The gang would kill any member who was believed to be cooperating with the police. (Dkt. 409 at 110).

In addition to punishing gang members who broke the rules, loyal gang members were rewarded by the gang. For gang members serving prison sentences, Crips leaders such as Trena Ridge and defendant Knight arranged to smuggle money and drugs into the prison through prison guards and female gang members. Gang leaders also worked to intimidate witnesses or persons bringing complaints against gang members. (Dkt. 400 at 91).

While gang members were often members of subsets of the Crips, the membership of these subsets overlapped and evolved. Further, the primary loyalty of the gang members was to the Crips generally, and leaders worked to obtain cooperation as to the subsets of the Crips.

The profitable facilitation of drug trafficking was a common purpose of the Crips. According to Crips gang member and co-defendant Armand Little, an important requirement for each gang member was "being down for the gang," which meant "everybody got each other's back, you know, helping each other make money." (Dkt. 409 at 100). Gang member and co-defendant Trena Ridge

testified that despite occasional fights between individuals, the members of the Crips would generally work together as a whole for the purpose of "making money." (Dkt. 400 at 60). Gang member Dontae Davis testified that the OGs of the Wichita Crips developed three laws: "mac, money and murder." (Dkt. 388 at 104; 400 at 55). Asked to explain these laws, Davis stated that mac meant to "mac as many chicks, females as possible." (*Id.* at 106). The gang obtained its money by selling drugs. "The murdering was obvious." (*Id.*)

The evidence was sufficient for a reasonable juror to find that the Crips operated in Wichita as an "enterprise" within the meaning of § 1962, and that drug trafficking by members of Crips were actions taken in furtherance of the common purpose of the enterprise.

With respect to his Count 2 conviction for RICO conspiracy, Randall argues that on the basis of the Indictment he has "no clue" as to the nature of the predicate acts (Dkt. 459 at 5), and that the underlying predicate acts could not be Counts 3 and 4, since the jury found him not guilty on those counts. (*Id.* at 6-7). Accordingly, he seeks acquittal or new trial on his conviction for RICO conspiracy.

Randall's acquittal on Counts 3 and 4 do not compel the conclusion that no reasonable jury could find that he committed the predicate offenses. Even if the jury's verdict in this context might be viewed as inconsistent, "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." *Dunn v. United States*, 284 U.S. 390, 393 (1932) (recognizing that in some cases jury verdicts of acquittal may be the product of lenity rather than a necessary finding as to guilt or innocence). *See also United States v. Powell*, 469 U.S. 57, 62-64 (1984) (reaffirming *Dunn*). The rule in *Dunn* has been repeatedly applied by the Tenth Circuit to uphold conspiracy convictions from attacks for alleged inconsistency where the defendant was

13

acquitted on an underlying substantive count. *See United States v. Alvarez*, 75 Fed.Appx. 745, 747 (10th Cir. 2003); *United State v. Briseno-Mendez*, No. 96-2218, 1998 WL 440279, *15 (10th Cir. July 17, 1998); *United States v. Jaynes*, 75 F.3d 1493, 1508-09 (10th Cir. 1996).

The Eleventh Circuit has also applied this rule in the specific context of a RICO conspiracy charge, the court holding that acquittal on the substantive count did not compel rejection of the jury's conviction on the conspiracy charge on the grounds of inconsistency, both because "the jury could have found that [the defendant] agreed to participate in the enterprise through the commission of two predicate acts without finding that he actually committed the two predicate acts," and in any event under Dunn "inconsistent verdicts rendered in the same proceeding ordinarily cannot be upset." *United States v. Russo*, 796 F.2d 1443, 1462 (11th Cir. 1986). Accordingly, the mere fact that the jury acquitted Randall on Counts 3 and 4 does not in itself establish that these predicate acts could not serve as a basis for the RICO conspiracy conviction.

Further, as noted earlier, the government was not required to prove that defendant Randall himself actually committed the underlying predicate offenses. It was sufficient if the defendant agreed to participate in the conspiracy with knowledge of its common purpose, and knowledge that two predicate acts would be committed in furtherance of the conspiracy.

There was substantial evidence that Randall was a long-standing member of the Wichita Crips. There was also evidence that it was not possible to be a member of the Crips without engaging in illegal activity. Finally, there was evidence tying defendant Randall to the relevant predicate acts set forth in Instruction No. 17.

**Other Allegations of Error by Knight**

Knight alleges that his right to a fair trial was compromised by the submission of evidence of uncharged conduct and the denial of his counsel's pre-trial motion on the issue (Dkt. 336), and that his counsel was given inadequate time to prepare for cross-examination of witnesses as to the alleged conduct. Knight also generally asserts that error arises from the denial of other pre-trial motions. Knight supplies no additional argument, but lists (Dkt. 460, at 20-21) the following motions:

- Motion to Suppress warrant search of 1008 S. Waverly (Doc. 254).
- Motion to Suppress warrant search on North Volutsia (Doc.155).
- Motion to Strike Predicate Acts 27a and 27b (Doc. 239)
- Motion to Exclude Government's Expert Testimony (Doc. 319).
- Motion to Suppress evidence related to Case 97-C-44429 (Doc. 323).
- Motion for Exclusion of Unrelated Acts (Doc. 337).
- Motion for Bill of Particulars (Doc. 121).
- Motion to Exclude Co-Conspirator Hearsay. (Doc. 220)
- Motion to Withhold Indictment. (Doc. 274).

These motions were previously ruled on by the Court (Dkt. 256, 283, 310, 317, 329, 382, 399 at 13-14), and the Court finds no basis for modifying its prior rulings.

With respect to the general evidence of uncharged conduct, the government sought admission on three grounds. First, the evidence is admissible to show the continuity of the RICO racketeering activity. *See, e.g., See United States v. Richardson*, 167 F.3d 621, 625-26 (D.C. Cir. 1999). Second, the evidence is admissible under *Giglio v. United States*, 405 U.S. 150 (1972) as potentially impeaching evidence of an accomplice. Finally, the government contended that the evidence is admissible under Rule 404(b) to rebut any claim by the defendants that they lacked the motive or plan to carry out the RICO conspiracy – and showing its origin and its nature.

The court carefully reviewed the lengthy list of uncharged conduct, excluding certain evidence and allowing other evidence. In each instance, the specific allegation was weighed as to its prejudicial

effect and its probative value. The court then denied Knight's motion to exclude the testimony of

co-operating witnesses, finding that the evidence showed

> that gang members: 1) have made claims of violence (including the alleged statements of the defendants bragging about crimes of violence or being the "head gunslinger" in Wichita); 2) have been found with drugs or firearms, would be admissible to show the nature of the conspiracy. *See United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992) ("evidence of numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles" admissible because it proved "the existence and nature of the RICO enterprise [and] a pattern of racketeering activity by each defendant").

(Dkt. 382 at 3). Further, in addition the court stressed that it would "carefully instruct the jury" as

to the limited use for this evidence. *Id.*

With respect to the complaint that additional time was not provided counsel to prepare for

this evidence, the court is not unsympathetic to the demands imposed on counsel by this complex

case. However, the court addressed this issue prior to trial and specifically denied Knight's request

for additional time to prepare for trial. Balancing the nature of "the discovery presented, the limiting

instruction to be granted by the court, and the time remaining before the testimony of the

government's witnesses," the Court found that delay of the trial was not justified.  (Dkt. 382 at 3).

The Court further notes that the subsequent course of the trial - in which the evidence in question was

presented well after the commencement of this month-long trial, and in which counsel was able to

vigorously and effectively cross-examine the relevant witness, supports this decision.


**Jury Instructions**

With respect to the jury instructions, Knight identifies three particular errors:  (1) "Omission

of the word "general" when describing the defendant's knowledge of the existence of the enterprise"

in the last paragraph of Instruction No. 18; (2) "Omission of the word "legitimate" when describing "ongoing business" in the last paragraph of Instruction No. 19, (3) the use of disjunctive language rather than the conjunctive language used in the Indictment, and (4) the failure to include an instruction on withdrawal from conspiracy. More generally, "to the extent that any other jury instruction was confusing, misleading or may have been an erroneous statement of the law, Mr. Knight objects and requests a new trial." (Dkt. 460, at 22). Other than this list of alleged errors, Knight provides no argument in support of the relief sought.

The court finds no error justifying acquittal or the award of a new trial. Instruction No. 18 explained the association element of the substantive RICO count.  The challenged last paragraph explained:

> A person cannot be associated with or employed by an enterprise if he does not know of the enterprise's general existence or the nature of its activities. Thus, in order to prove this element, the government must prove beyond a reasonable doubt that the defendant was connected to the enterprise in some meaningful way, and that the defendant knew of the enterprise's general existence of the enterprise and of the general nature of its activities.

The instruction is modified from Tenth Circuit Pattern Criminal Instruction 2.76.4. Instruction 18 added the first two "generals" in the cited passage; the third and final "general" exists in the Tenth Circuit's pattern instruction.

Knight challenges the "[o]mission of the word 'general' when describing the defendant's knowledge of the existence of the enterprise." (Dkt. 460 at 21). To the extent that Knight is complaining that the Court did not instruct the jury that a person cannot be guilty "if he does not generally know of the enterprise's existence or the nature of its activities," no error exists. Defendant fails to explain how such an instruction would be materially different from the instruction as given.

17

It may be, however, that Knight means to challenge the *inclusion* of the additional "general" language. It is, after all, that addition which represents the sole difference from the pattern instruction. The "general" words were added at the instruction conference at the suggestion of the government. (Dkt. 428 at 7). Ultimately the Court summarized the conference's modification of the draft instruction:

> THE COURT:    All right. Instruction Number 18, adding the word in the last paragraph on Page 21, A person cannot be associated with or employed by an enterprise if he does not know of the enterprise's -- I'm going to add the word general before, Existence or the nature of its activities.
>
> MS. BARNETT:  No objection.
>
> MR. KERNS:    Just as what was previously noted.
>
> MS. SHANEYFELT:    No objection.
>
> MR. TURNER:   No objection.

*Id.* at 45.

The court finds no error, clear or otherwise, in the instruction as given. Knight cites no authority holding that RICO liability requires proof of the specific nature of the criminal enterprise's activities.

Instruction No. 19 explained the predicate acts element of the substantive RICO count. The last paragraph states:

> To prove that the racketeering acts pose a threat of continued racketeering activity, the government must establish that (1) the acts are part of a long-term association that exists for criminal purposes; or (2) the acts are a regular way of conducting the defendant's ongoing business; or (3) the acts are a regular way of conducting or participating in an ongoing enterprise. A threat of continued unlawful activity may be established when the evidence shows that the racketeering acts are part of a long-term association that existed for criminal purposes or when the racketeering acts are shown to be the regular way of conducting the affairs of the enterprise. In deciding whether there is a threat of continued racketeering activity, you are not limited to specific racketeering acts charged against a defendant; rather, in addition to considering such acts you also may consider the nature of the enterprise and other unlawful activities of

the enterprise and its members viewed in their entirety, including both charged and uncharged unlawful activities.

The instruction is modeled on Tenth Circuit Pattern Criminal Instruction 2.76.5. The court modified the pattern instruction to tailor the charge to the circumstances of the present case by removing the word "legitimate." In doing so, the Court explicitly agreed with the government's argument

> that those [pattern] instructions are written in a way to apply not only to enterprises that are completely illegitimate in purpose, as well as to enterprises that are legitimate. For example, sheriff's office or someplace like that, that actually then is engaged in a pattern of racketeering. So I guess I am just asking the Court to consider modifying or tailoring the instruction to fit this situation.
> ….
> I would just ask the Court to look at *U.S. vs. Turkette* [452 U.S. 576 (1981)].
> You can have a wholly illegitimate and illegal enterprise, as well as you can have a sheriff's office that becomes a criminal enterprise through a pattern of racketeering activity.
> In this case we are alleging that the Crips are a wholly illegal and illegitimate enterprise.

(Dkt. 428 at 14-15).

In *Turkette*, the Supreme Court held that a RICO enterprise was not limited to entities that are partially legitimate and partially illegitimate, but "is equally applicable to a criminal enterprise that has no legitimate dimension or has yet to acquire one." 452 U.S. at 591. Here, the allegation and the evidence of the government are that the Crips in Wichita were a completely illegitimate enterprise, primarily focused on drug trafficking, prostitution, and other criminal activities. The evidence of the defendants was limited to attempting to show that the Crips were not a single entity and that they were not members of the gang or any of its subsets. But no substantial evidence was presented showing that the Crips in Wichita had any substantial, legitimate activity aside from the core, criminal activity.

19

Accordingly, the court finds that the instruction was properly modified to the circumstances of the present case and finds no error.

Finally, defendant Knight argues that it was error for the court to issue instructions in the disjunctive where the original indictment included conjunctive language. The instructions were not erroneous on this basis. *See United States v. Simpson*, 94 F.3d 1373, 1378 (10th Cir. 1996); *United States v. Earls*, 42 F.3d 1321,1327 (10th Cir. 1994); *United States v. Austin*, 933 F.2d 833, 843 (10th Cir. 1991).

With respect to Instruction Number 24, which instructed the jury as to the elements of a RICO conspiracy, defendant Harris argues that the court "identifies only three elments," not six elements as "laid out succinctly and in specific order" as in *United States v. Smith*, 413 F.3d 1253, 1266 (10th Cir. 2005), and the Court "jumbled the order" of the elements. (Dkt. 461 at 3). The compounding of the separate elements, he argues, "le[ft] the factfinder with a directive that is as clear as mud." *Id*. He also argues that the instruction was erroneous in informing the jury that it need not actually find that a defendant personally committed the predicate acts or that the RICO enterprise was actually established.  He argues that as a result, the instruction was clearly erroneous.

At the instruction conference, after the court specifically inquired if there was any objection to Instruction No. 24, counsel for Harris responded "No, your Honor."  (Dkt. 428, at 28).

Harris's argument is without merit. Instruction 24 adequately informs the jury of the elements it was required to find for RICO conspiracy. The order of the instructions is not controlling; the Court instructed the jury that it was required to follow all of the instructions, without preference for one over another. In *Smith*, the court set forth as six separate elements what the government was required to prove to show a violation of 18 U.S.C. § 1962(d), but in doing so it was not approving or even

reviewing any particular jury instruction. Further, an instruction under § 1962(d) which fairly states the factual findings necessary under statute but does so in three elements is not erroneous on that basis alone. *United States v. Quinones*, 511 F.3d 289, 315-16 (2nd Cir. 2007).

With respect to whether the government must prove the actual existence of a RICO enterprise as a predicate to a violation of § 1962(d), while the *Smith* court reviewed what would constitute, prior to Boyle, a RICO enterprise, it further specifically noted that the defendant appellant there did not challenge the existence of the enterprise, and so explained that "we do not consider" that element in the appeal. 413 F.3d 1253.

Unlike the general conspiracy statute, 18 U.S.C. § 371, the RICO conspiracy statute does not require proof of an overt act in furtherance of the conspiracy; it is sufficient if the government proves that a defendant agreed to the criminal objective of the conspiracy. *Salinas v. United States*, 522 U.S. 52 (1997). The government is not required to prove the defendant committed two predicate acts, or that he agreed to commit the two predicate acts. It is sufficient if the government proves that a defendant agreed to the criminal purpose of the prospective enterprise.

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

> It makes no difference that the substantive offense under § 1962(c) requires two or more predicate acts. The interplay between subsections (c) and (d) *does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense.*

*Id.* at 65 (emphasis added). *See United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998) (RICO conspiracy requires proof (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense); *United States v. Bennett*, 44 F.3d 1364 (8th Cir. 1995) (the government need not prove defendant personally agreed to commit the requisite acts, only that he agreed to join the conspiracy); *United States v. Tille*, 729 F.2d 615, 619 (9th Cir.), *cert. denied*. 469 U.S. 845 (1984) (defendant need not agree to personally commit two racketeering acts).

The result is equally true as to proof of the actual existence of an enterprise. The gravamen of the offense is the "unlawful conspir[acy] to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). The statute does not require proof that all of the elements of the substantive offenses of § 1962(a), (b) or (c) actually occurred. Pursuant to *United States v. Salinas*, 522 U.S. 52, 61-66 (1997) (RICO conspiracy may exist "whether or not the substantive crime ensues"), it is sufficient if the government proves a defendant knowingly entered into a criminal agreement to achieve this end, with the further agreement that at least two racketeering acts would be committed in furtherance of the conspiracy. For purposes of the RICO conspiracy statute, "it suffices that [the defendant] adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65. The government need not prove all of the elements of the substantive RICO offense actually occurred. *See Smith v. Bird*, 247 F.3d 532, 537 (3rd Cir. 2001).

Here, Instruction 24 (1) required the jury to find that the object of the conspiracy was the creation of "an enterprise that affected interstate commerce through a pattern of racketeering activity," (2) explicitly provided that such an enterprise was defined in the same manner as that provided in the instructions governing the substantive RICO charges, and (3) required the finding that the enterprise

would be established "if the conspiracy were completed as contemplated." The instructions provided by the Court were not erroneous. *See United States v. Jones*, No. 05-CR-322, 2007 WL 1428464, *13 (N.D.N.Y. May 11, 2007) (rejecting challenge to RICO conspiracy instruction defining the goal of the conspiracy to be a criminal enterprise within the meaning of the § 1962(c), but that otherwise the government was "not required to prove that the alleged enterprise was actually established").

Finally, defendant Harris also suggests that Instruction 24 was erroneous because it contained a reference to "the Indictment which was sent back to the jury along with the instructions" and that "the Indictment listed in paragraph 10 all of the racketeerings acts … allow[ing] impermissible consideration of other alleged offenses." (Dkt. 461 at 5). This is incorrect. In Instruction 19, the Court listed only those predicate racketeering acts which the jury was permitted to consider.  Further, the copy of the Fifth Superseding Indictment which was read to the jury was carefully redacted to exclude all but these specific offenses.

Finally, both Harris and Knight argue that the Court erred in failing to grant the withdrawal instruction requested by defendant Harris. Tenth Circuit Pattern Criminal Jury Instruction No. 2.22 provides:

> The defendant has raised the affirmative defense of withdrawal from the conspiracy.
> If you have first found the defendant was a member of the conspiracy charged in count _____, then you must determine whether the defendant thereafter withdrew from the conspiracy.
> In order to find that the defendant withdrew from the conspiracy, you must be convinced that the defendant has proven by a preponderance of the evidence that he took an affirmative step to either defeat the purpose of the conspiracy or to tell his coconspirators that he was no longer participating in the conspiracy.

However, the evidence supporting such an instruction is either insufficient (in the case of defendant Harris) or simply non-existent (in the case of defendant Knight). The only evidence cited

by the defendant Harris, (Dkt. 461 at 11), is essentially speculative inferences based on the fact that he was sometimes *not* seen in connection with gang activity. The cited evidence is in fact simply an absence of evidence; more is required to justify the requested instruction.

> Generally, the defense of withdrawal from a conspiracy
>
> requires affirmative action, but certainly that is no hardship. Having joined in an unlawful scheme, having constituted agents for its performance, scheme and agency to be continuous until full fruition be secured, until he does some act to disavow or defeat the purpose he is in no situation to claim the delay of the law. As the offense has not been terminated or accomplished, he is still offending. And we think, consciously offending, – offending as certainly, as we have said, as at the first moment of his confederation, and continuously through every moment of its existence.

*Hyde v. United States*, 225 U.S. 347, 369 (1912). Further, with respect to withdrawal from a RICO conspiracy, the defense requires affirmative steps inconsistent with the object of the conspiracy to disavow or to defeat the conspiratorial objectives. *United States v. Starrett*, 55 F.3d 1525 (11th Cir. 1995).

The court properly denied the requested instruction. The requested pattern instruction only applies where the defendant takes an affirmative step to either defeat the purpose of the conspiracy or to tell the coconspirators that he was no longer participating in the conspiracy. Here, the defendants failed to show that they were entitled to such an instruction.

**Impeachment Evidence**

Citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and *Giglio v. United States*, 405 U.S. 150, 154 (1972), Knight argues that his right to a fair trial may have been compromised by the failure of the government to supply potential impeachment evidence which would have showed that one witness has received favorable treatment. The witness testified at trial that he did not then have any reason to expect lenient treatment from the government. The government vigorously denies that any arrangement with the witness occurred until after the conclusion of the present trial.[1]

The court finds that a new trial is not justified on the grounds sought. Application of the disclosure requirements of *Brady* and *Giglio* do not arise based on "the mere fact that a witness desires or expects favorable treatment in return for his testimony is insufficient; there must be some assurance or promise from the prosecution that gives rise to a *mutual* understanding or tacit *agreement*. *United States v. Akrawi*, 572 F.3d 252, 263 (6th Cir. 2009) (*citing Bell v. Bell*, 512 F.3d 223, 233 (6th Cir.2008) (*en banc*)) (emphasis in *Akrawi*). In addition, "the mere fact of favorable treatment received by a witness following cooperation is also insufficient to substantiate the existence of an agreement." *Id.*

Knight has presented no evidence that the witness, who testified that at the time he had a mere hope for favorable treatment and not any arrangement or deal with the government, testified untruthfully. The mere fact that this witness's hopes later came true does not establish, in the absence of any further evidence and in the face of the direct representation to the contrary by the government

---

[1]The government also properly points out that as the arrangement in the case involving the witness was sealed, this section of the defendant's motion should also have been filed under seal.

(Dkt. 465 at 11), that any deal actually existed at the time of the witnesses testimony.  Accordingly, the defendant's allegation of error justifying new trial is denied.

**Harris's Predicate Acts**

Harris argues that the evidence was insufficient to support the RICO conspiracy conviction as to the underlying predicate acts, first, as to Predicate Act 13 (maintaining a drug house), because there was insufficient evidence showing he was the owner of a house or that he was aware of the activity, and, as to Predicate Acts 26 and 27 (alleging drug distribution), these charges are also reflected in Counts 3 and 20 and he was acquitted on these charges.

Harris's argument is without merit.  First, as discussed above, it was not necessary for the government to prove that Harris specifically agreed to any particular predicate act; it was sufficient that he agreed with the purpose of the conspiracy, with the knowledge that acts in furtherance of that purpose would be undertaken by members of the gang. Second, speculation as to why the jury may have acquitted Harris as to Counts 3 and 20 is precisely that. There was abundant evidence supporting Harris's involvement in drug trafficking with gang members, as well as his association with the alleged drug house.

**Fraud**

Wire fraud under 18 U.S.C. § 1343 arises when a defendant, uses wire communications in furtherance of a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, and does so with the intent to defraud. *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003). Harris argues that there was insufficient evidence to support

a finding of wire fraud, relying in particular on *United States v. Cochran*, 109 F.3d 660 (10th Cir. 1997).

In *Cochran*, the court held that to support a charge of wire fraud, the government must demonstrate either actual or potential harm to the victim, or provide independent evidence of fraudulent intent. 109 F.3d at 668. In this context, actual or potential harm to the victim is not a separate element of wire fraud, it is simply an additional means of demonstrating that the defendant acted with intent to defraud. *See Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 1841 (1999) (noting that common-law fraud concepts of justifiable reliance and damages "plainly have no place in the federal fraud statutes"). The ultimate success of the fraudulent misrepresentation is immaterial. *See United States v. Marchese*, 46 F.3d 1020, 1023 (10th Cir. 1995) (mail fraud).

The court in *Cochran* observed:

"[A] scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." *United States v. Hanson*, 41 F.3d 580, 583 (10th Cir.1994). The objective reference to "persons of ordinary prudence or comprehension" assists in determining whether the accused's conduct was "calculated to deceive." [*United States v.*] *Drake*, 932 F.2d [861,] 864 [(10th Cir. 1991). Fraudulent intent is required. *United States v. Themy*, 624 F.2d 963, 965 (10th Cir.1980). That said, **a scheme to defraud by false representations may be accomplished by patently false statements or statements made with a reckless indifference as to their truth or falsity, and deceitful concealment of material facts may constitute actual fraud.** *Williams v. United States*, 368 F.2d 972, 975 (10th Cir.1966), *cert. denied*, 386 U.S. 997, 87 S.Ct. 1317, 18 L.Ed.2d 345 (1967); *Gusow v. United States*, 347 F.2d 755, 756 (10th Cir.), *cert. denied*, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). "[E]ven though a defendant may firmly believe in his plan, his belief will not justify baseless or reckless representations."

109 F.3d at 664-665 (emphasis added).

Here there was evidence from which a rational jury could have determined that Harris employed a scheme to defraud with the requisite intent. Harris falsely responded to the Countrywide

Home Loan application, representing that none of the money being used to purchase the home was borrowed from another source. This response was, in the words of *Cochran*, a patently false statement. It was also material. A representative of the lender testified that the loan would not have been issued if the applicant had indicated there was another undisclosed lender in the background.

Harris rationalizes his false statement in his brief on the grounds that his false answer occurred in response to "a long series of questions." (Dkt. 461 at 12). But this is an argument for the finder of fact. Reviewing the evidence in the light most favorable to the government, a rational jury could disbelieve such a rationalization, and conclude that the existence of the additional borrowing was deliberately concealed, and the delivery of such a patently false answer was evidence of fraudulent intent. Accordingly, substantial evidence supports Harris's conviction for wire fraud.


**Prosecutorial Misconduct**

Finally, Randall suggests that the government is guilty of prosecutorial misconduct in its presentation of a transcript to accompany the playing of songs from a CD seized from Knight's home. He alleges that the transcript is inaccurate, in that it inaccurately uses his street name of "June" in two places, and that the transcript assumed excessive importance since, in light of the participants' heavy use of racial epiphets and sexual profanity, the songs were "so vile and difficult to listen to." (Dkt. 459 at 7).

The transcript was displayed on the jury's monitors as the songs (Govt Exh. 104-A and 104-B) were played. The transcripts were prepared prior to their presentation to the jury by police officers Brad Elmore and Clint Snyder who listened to the songs. Elmore testified that the transcription was difficult because some of the lyrics were unintelligible, and the resulting transcripts contain frequent

indications that words have been omitted. He testified: "[t]here were some words that we couldn't understand, and there is holes in the transcript where we couldn't understand what they were singing, but we tried our best to get the words down accurately."

Randall did not object to the playing of the songs, and despite specific inquiry from the court, did not object to showing the transcript as it scrolled in sync with the song audio.[2] The court cautioned the jury at the time that

> as is the case with all transcripts, where you actually are hearing what is purportedly transcribed, where your hearing differs from the transcript, you trust your hearing. The transcript is only an aid to your understanding what you're hearing, okay? So if you think there is a difference, trust your hearing.

(Dkt. No. 397 at 220). And prior to deliberations, in Instruction No. 9, the court again cautioned the jury with respect to transcriptions, which were given only to help

> you follow the conversation and identify the speakers. The recordings themselves are the evidence in the case — the transcripts are not evidence. In other words, what you see and hear on the recordings is evidence. The transcript is not. If you perceive any variation between the two, you will be guided solely by the recordings and not by the transcripts.
>     If you cannot, for example, determine from the recording that what words were spoken or who said a particular word or words, you must disregard the transcripts insofar as those words or that speaker are concerned.

A conviction may be overturned for prosecutorial misconduct where the misconduct violated the defendant's due process rights. *United States v. Kravchuk*, 335 F.3d 1147, 1153 (10th Cir. 2003), including the knowing presentation of false testimony. *United States v. Caballero*, 277 F.3d 1235, 1244 (10th Cir. 2002).

In response to a similar argument as to inaccurate transcriptions, the Tenth Circuit observed in *United States v. Johnson*, 132 Fed. Appx. 201, 208 (10th Cir. 2005), that

---

[2] Only defendant Knight objected to the transcripts. (Dkt. 397 at 219).

"[t]he admission of transcripts to assist the trier of fact ... lies within the discretion of the trial court." *United States v. Devous*, 764 F.2d 1349, 1354 (10th Cir.1985) (citation omitted). Cautionary instructions are instrumental to the analysis of whether the district court has abused its discretion with respect to written transcripts. *See United States v. Davis*, 929 F.2d 554, 559 (10th Cir.1991). In light of the detailed cautionary instruction given in this case, we cannot say the district court abused its discretion in admitting the transcripts. *Hale v. Gibson*, 227 F.3d 1298, 1325 (10th Cir.2000) (juries are presumed to have followed instructions).

The court finds no evidence that the government knowingly presented false evidence and no indication that the jury disregarded its instructions to the prejudice of the defendant. The lyrics of the songs are difficult to understand, and the alleged errors in the transcription, assuming Randall's alternatives are the correct interpretation, have not been shown to be the product of bad faith. More importantly, the court gave careful and considered limiting instructions to the jury, both at the time the records were played for the jury and again in its final instructions.

IT IS ACCORDINGLY ORDERED this 20th day of November, 2009, that the Motions of Acquittal or New Trial of the defendants Randall (Dkt. 422), Knight (Dkt. 419) and Harris (Dkt. 461) are hereby denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

30